Filed 7/19/21  In re M.C. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | B308648 (Los Angeles County Super. Ct. No. 20CCJP00643A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. R.C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Emma Castro, Commissioner.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court denied custody, reunification services and visitation to appellant R.C. (father), the noncustodial, presumed father of M.C. (born July 2011). Father does not take issue with the court's denial of custody or reunification services. He contends only that the court abused its discretion in concluding it was not in M.C.'s best interest to grant father visitation while father was incarcerated in Arkansas. Finding no error, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Eight-year-old M.C. and her half-sister came to the attention of respondent Department of Children and Family Services (DCFS) on December 18, 2019, after a violent altercation between the girls' mother, M.R. (mother), and her live-in companion during which mother stabbed her companion in the arm.[1]

M.C. told a DCFS social worker that she had been woken on the night of the incident by mother's screams. When the child saw the companion holding his wound, and saw blood pooled on the bed and floor, she began to scream herself. M.C. believed mother had acted in self-defense. M.C. told DCFS that she had no relationship with her biological father and knew only that her "real dad would hit [mother]."

Mother told DCFS that father had had no part in M.C.'s life since the child was an infant and mother "fled from" father to escape his

---

[1]     Mother and M.C.'s half-sister are not parties to this appeal.

severe domestic violence.  In late January 2020, M.C. was placed in the care of her maternal grandmother (MGM).

On February 3, 2020, DCFS filed a Welfare and Institutions Code[2] section 300 petition alleging that M.C. and her half-sister were at substantial risk of harm due to mother's drug abuse and domestic violence with her companion.

The detention hearing was conducted on February 4, 2020. Mother reported that father was incarcerated in Arkansas, and that she had no contact with him.  The juvenile court found father to be M.C.'s presumed father and appointed counsel for him.  M.C. was detained and placed in MGM's care.  The juvenile court gave mother monitored visitation, subject to permission by the criminal court.  The court ordered DCFS to try to interview father at his Arkansas prison facility.

During DCFS's investigation of this matter, mother reported that, during her relationship with father he abused her "in every way."  She had moved with father to Arkansas after she became pregnant with M.C.  Mother said father had raped her repeatedly and threatened her and her family.  Father told mother that, if she left him, he would find her, cut her into pieces, dispose of her body and take M.C. away. Mother reported that, while in Arkansas, father had "[done] so many drugs," stolen regularly and given mother the worst beating ever. Father had been incarcerated when M.C. was four months old and mother seized the opportunity to flee with M.C. to California.  Mother

---

[2]     Statutory references are to this code.

told the social worker that father had never provided for M.C. financially or emotionally, and had been in and out of jail M.C.'s whole life.

DCFS reported that father was currently serving a 96-month prison sentence and was not expected to be released from incarceration or eligible for parole for several years. Based on father's history of violent crime dating back to 2009, his current long-term incarceration in Arkansas, and his failure to provide for M.C.'s basic needs, DCFS opined that father was ineligible for reunification services, including any contact or visitation with M.C., pursuant to section 361.5, subdivision (e)(1).

The adjudication hearing began on August 24, 2020. The juvenile court sustained the petition's allegations of domestic violence. The matter was continued for disposition to permit an attorney to contact father.

On September 9, 2020, father completed a standardized form indicating that he was M.C.'s father, and that the child had lived with him following her birth in July 2011 to December 2011. Father claimed he had told family and friends that M.C. was his child and cared for her as a baby. He also claimed he had a number of telephonic visits with M.C. during his incarceration and had provided the child with clothing and toys.

Father requested that M.C. be placed with a paternal aunt (PA). When contacted by DCFS, the PA said she was not a part of M.C.'s life and had not seen or spoken to the child for as long as three years.

4

Nevertheless, the PA wanted to be considered as a possible relative caregiver.

Father attended the September 9 hearing telephonically. His counsel reiterated father's claim that he had lived with and provided care for M.C. for five months following the child's birth. Counsel also confirmed that father had received a 96-month sentence in 2018 and was currently incarcerated in Arkansas. Father had no scheduled release date but had a parole hearing scheduled for August 2021. The matter was continued for DCFS to assess the PA as a possible placement.

Prior to the continued adjudication and disposition hearing on October 2, 2020, both mother and MGM informed DCFS that, contrary to father's representations, M.C. had had almost no contact with father or any paternal relative and shared no bond with father's family. The MGM informed DCFS that she had essentially raised M.C. for most of her life. MGM was amenable to the provision of services for mother while she and M.C. resided in MGM's home. MGM and mother each told DCFS they wanted MGM to be M.C.'s legal guardian or to adopt the child.

Joined by M.C.'s counsel, DCFS argued there was insufficient evidence to suggest that it would be in M.C.'s best interest to provide reunification services to father. Father's counsel argued there was insufficient evidence to show the absence of a bond between father and M.C. and requested a home-of-parent-father order, with the plan that M.C. would reside with the PA. Alternatively, counsel requested that

5

father be given reunification services, including telephonic or video visitation while incarcerated.

In response to the court's questioning, father said he was currently incarcerated for aiding and abetting a fugitive and for a parole violation. Although father claimed that only 11 months remained in his sentence, the court noted that no there was no evidence to support that claim.

M.C. was declared a juvenile court dependent, and the court ordered her returned to mother's care on the condition that mother reside with MGM and miss no drug tests. The juvenile court denied father's request for custody pursuant to section 361.2, concluding it would be detrimental to M.C.'s safety, protection, and physical and emotional well-being.

The court also denied father's request for reunification services and visitation. The court observed that its ruling was based on the fact that there was no evidence that nine-year-old M.C. had any relationship with her father who had subjected mother to "some of the most serious domestic violence" the court had seen. Indeed, the physical abuse had been so severe that mother fled father in fear for her life when M.C. was an infant. Father also had failed to provide for M.C., had not seen M.C. since she was four months old, and had no bond with the child. In addition, father had received a 10-year prison sentence term in 2017, and an additional eight-years in 2019.

For these reasons, the court bypassed the provision of reunification services pursuant to section 361.5, subdivision (e)(1), and

found by clear and convincing evidence that the provision of such services to father would be detrimental to M.C., as would visitation. The court noted that it was disinclined to order M.C. transported to Arkansas to visit a man she did not know and whom she had expressed no interest in getting to know. Father's counsel posed no objection.

This timely appeal followed.

## DISCUSSION

Father's sole contention on appeal is that the juvenile court abused its discretion in denying him visitation.[3] He is mistaken.

Because father was denied reunification services pursuant to section 361.5, subdivision (e)(1), his right to visitation as a noncustodial parent is governed by section 361.5, subdivision (f). (Cf., *In re A.L.* (2010) 188 Cal.App.4th 138, 140–141 [No reunification services are required for a noncustodial parent where the dependent child is not removed from the custodial parent].) That statute provides that the "court *may* . . . permit the parent to visit the child unless it finds that visitation would be detrimental to the child." (Italics added.) The permissive statutory language reflects the reality that "visitation is not integral to the overall plan when the parent is not participating in the reunification efforts." (*In re J.N.* (2006) 138 Cal.App.4th 450, 458–459 (*J.N.*); *In re Korbin Z.* (2016) 3 Cal.App.5th 511, 518, fn. 5.)

---

[3] Father does not challenge the court's findings, made on clear and convincing evidence, that the provision of reunification services to father would be detrimental to M.C. Visitation is a component of reunification services. (See § 361.5, subd. (e)(1)(C).)

Where, as here, a dependent child remains in the custody of a parent subject to DCFS supervision, the court has broad discretion to determine how best to serve and protect the child's interests, and to fashion appropriate disposition orders for the care, supervision, custody, conduct, maintenance, and support of the child. (*In re Kayla W.* (2017) 16 Cal.App.5th 409, 418 (*Kayla W.*); § 362.) Such orders include the discretion to deny visitation for a noncustodial parent. (*Kayla W.*, at p. 418; see *In re Destiny D.* (2017) 15 Cal.App.5th 197, 212–213.) "The goal of dependency proceedings—to reunify with at least one parent—has been met when, at disposition, a child is placed with a former custodial parent and afforded family maintenance services." (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20.)

In short, the juvenile court may deny parental visitation if it concludes that such visitation is not in the child's best interest. (See *J.N., supra,* 138 Cal.App.4th at pp. 458–459; *In re Alexis E.* (2009) 171 Cal.App.4th 438, 454 [at disposition, "'[t]he court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion'"].) We will not reverse the juvenile court's determination absent a showing of a clear abuse of discretion. (*In re I.R.* (2021) 61 Cal.App.5th 510, 522.)

Father insists the juvenile court abused its discretion in denying him visitation with M.C. based on concern regarding the difficulty of transporting the child to Arkansas. He notes there was no need to require M.C. to travel because telephonic or video visits could be arranged. Father forfeited this argument, however, by failing to object

8

on this specific ground. (*In re T.G.* (2015) 242 Cal.App.4th 976, 984 [failure to object to a dispositional order on a specific ground generally results in a parent's forfeiture of the right to pursue the issue on appeal].)

Father also takes issue with the court's order denying visitation because there is no "direct evidence" demonstrating the absence of a bond between M.C. and him. The same evidence that supports denial of reunification services for father supports the order denying visitation, a component of reunification services. M.C. reported that she had no relationship with father and that the only thing she knows about him is that he used to beat her mother. This statement is consistent with mother's claim that, during the few months in which father lived with M.C., he physically abused and threatened to dismember her and take M.C. away. Mother fled from father in fear for her life and continues to fear he may come after her.[4]

Further, father's claims that he provided for M.C. for some time were contradicted by mother and by MGM. Mother reported that father played no part in M.C.'s life after mother left him. This was consistent with MGM's assertion that she has been M.C.'s primary caretaker since the child was an infant, and the child has had virtually no contact with father or any paternal relative.

---

[4] At the disposition hearing the juvenile court noted that mother is advised by law enforcement "every time [father] is moved, so that she is informed of where he is at all times to ensure her physical safety and wellbeing."

Finally, father's history of perpetrating serious domestic violence against mother supports the court's denial of visitation. M.C.'s only knowledge about father was that he had beat mother. Moreover, this action was initiated after M.C. was exposed to a traumatic scene of domestic violence involving mother and her companion, in which M.C. believed her mother acted in self-defense. The court could reasonably conclude that in the wake of M.C.'s trauma at witnessing a violent incident between mother and mother's companion, visitation with father, who the child knew had seriously abused her mother, was not in M.C's best interests.

In short, the record demonstrates that the juvenile court acted within its discretion in denying visitation to father.

## DISPOSITION

The dispositional order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

MANELLA, P. J.

COLLINS, J.

10